17 NOV 22  AM 8:16

BY: ____

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY JAMES GODWIN, | Case No.: 3:16-cv-02650-BAS-KSC |
| Petitioner, | **REPORT AND** |
| v. | **RECOMMENDATION RE** |
| DAVID DAVEY, Warden | **PETITIONER'S WRIT OF HABEAS** |
| Respondent. | **CORPUS** |

Petitioner Jeremy J. Godwin, a state prisoner represented by counsel Marilee Marshall, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in California Superior Court[1] of two counts of aggravated sexual assault of a child with oral copulation, four counts of forcible lewd act on a child, and one count of child molestation with a prior conviction. He raises seven claims for relief asserting, *inter alia*, violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

This Court has reviewed the Petition, Respondent's Answer, Traverse, and accompanying lodgments and exhibits. For the reasons discussed in greater detail below, the Court recommends the Petition for a Writ of Habeas Corpus be **DENIED**.

---

[1] Case No. JCF25781

1

# PROCEDURAL BACKGROUND

Petitioner, Jeremey J. Godwin, is in the custody of respondent based upon a July 15, 2013 judgment in California Superior Court of Imperial County in which a jury convicted him of two counts of aggravated sexual assault of a child with oral copulation, four counts of forcible lewd act on a child, and one count of child molestation with a prior conviction. Petitioner was sentenced to 334 years to life. [Doc. No. 10-52, at p. 7124].

Petitioner appealed the judgment of conviction in the California Court of Appeal on November 1, 2013.[2] The conviction was affirmed, but the sentence was modified to dismiss the habitual sex offender sentence. [Doc. No. 10-75]. Petitioner sought further direct review of the decision on appeal by the California Supreme Court.[3] On August 26, 2015, the petition was denied. [Doc. No. 10-77].

On October 26, 2016, petitioner filed a petition for a writ of habeas corpus in the Southern District of California. [Doc. No. 1].

# FACTUAL BACKGROUND

The California Court of Appeals' unpublished opinion sets forth a summary of facts for this case. [Doc. 10-8, at 2-10]. This Court gives deference to the state court's findings of fact and presumes them to be correct; petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992). This Court has conducted an independent review of the trial record and confirms the Court of Appeals' factual findings comport with the record. The following facts are taken from the California Court of Appeals' Opinion and Decision affirming the judgment in the trial court:

> Jeremy Godwin [was convicted] of various sex offenses arising from his molestation of Jane Doe. . . .

//
//

---

[2] Case No. D064909.
[3] Case No. S227407.

Doe, age 20 at the time of trial, testified about numerous acts of molestation committed by her father (defendant) that started when she was a small child and continued until she was 13 years old.

Doe recalled an incident when she was "really small" when she and defendant were riding in a vehicle in the desert and defendant placed his hand between her legs and was "playing with [her] vagina . . . through [her] clothes." Consistent with this memory, Doe's mother testified that when Doe was five years old, she told her mother that defendant had been touching her "down there," pointing to her vaginal area. The matter was investigated; defendant was arrested; and in 1998 he pled guilty to committing a lewd act against Doe.

Because of his 1998 lewd act conviction, defendant was removed from the family for four years; the family received counseling; and defendant reunited with the family in about January 2002. Doe's mother testified she did not divorce defendant at the time because "[t]here was doubt," explaining that defendant told her he did not commit the molestation, "everything was just misconstrued," and he only pled guilty so she could be reunited with their children.

Doe recalled another incident that occurred when she was about nine years old and her brother was about three or four years old. On this occasion, Doe and her brother were not wearing clothes, she was on top of her brother, and her father was with them in the room. She did not remember further details, except that her brother's penis and her vagina were somehow "involved."

The remaining acts of molestation described by Doe occurred at the family's home on Cedar Avenue where they moved in July of 2002 when Doe was almost 10 years old, and at the family's home on Walnut Avenue where they moved in November 2003 when Doe was 11 years old.

During an incident at the Cedar residence, Doe woke up in the middle of the night on the couch, and defendant was "making out" with her, with his tongue in her mouth and his arms around her. The incident made her feel "uncomfortable." On another occasion, defendant performed oral sex by putting his mouth on Doe's vagina.

During an incident at the Walnut residence, Doe woke up on her parents' bed, and the defendant was on top of her with is penis in her vagina. Doe felt "very violated and very upset." On another occasion he had her sit on top of a

3

scanner and he scanned her vagina. On several occasions he woke her up so she could watch pornography with him. She felt "very uncomfortable" watching the pornographic movies, but felt "too afraid to say no."

Also, on multiple occasions at the Walnut residence defendant had Doe give him "blow jobs" when they were in his bathroom. He tried to ejaculate in her mouth; "usually, it ended up in a towel or some article of clothing"; and on one occasion he ejaculated "out on [her] chest." This conduct made Doe feel "gross," "very uncomfortable," and disgusted.

During another incident defendant brought a dog into his bedroom and told Doe to "get down on all fours" because he wanted to "put the dog on top of [her] and put the dog[']s penis in . . . somewhere." Doe refused, and defendant instead got "on all fours" and had the dog get on top of him. Doe felt "really grossed out."

Doe recalled several other incidents of sexual molestation at the Walnut residence, including an incident in defendant's bedroom when he put vibrators on her vagina; another incident in the bedroom when he put his finger in her vagina; and several incidents in the bedroom and living room when he would masturbate in front of her. Doe testified she did not know whether defendant molested her "every week or every month" while they lived at the Walnut residence, but she knew it happened "at least a few times in one month, and few can be anywhere from two to ten times."

Regarding her relationship with her father, Doe testified he was the primary caregiver for her and her brother. Her mother was frequently gone from home at work and they were not emotionally close. When Doe was small, she and defendant were "very close," and she loved him and was like a friend to her. As Doe got older, she did not feel as close to him; she did not know how to feel about him; and she knew that what was occurring was not right.

Doe did not recall defendant using physical discipline with her, but she testified she was afraid of him when she was growing up because she was not "sure what he could do." She remembered an incident in which defendant tied her and her mother to the bed in his bedroom. Her father and mother engaged in loud arguments; there was a lot of shouting, slamming of doors, and slamming of hands on tables; and defendant was sometimes violent. For example, on one occasion he held her mother in a headlock and on another threw a chair. During the headlock incident, her mother yelled that Doe

should call 911 an when Doe went to get the phone, defendant threw the phone.

Doe's mother confirmed that she was often gone from home at work, including at night, and defendant took care of the children when she was not at home. Consistent with Doe's testimony, Doe's mother testified there was always a lot of pushing, shoving, throwing of objects, and screaming between her and defendant, and during the incident when she asked Doe to call 911 defendant pulled the phone out of the wall and threw it.

Doe testified she did not know what to do about the molestation because defendant was her father and she had been taught to respect her elders; she had never gone against him because she was afraid of him; she did not know "how to go about confronting the issue"; and she was afraid to say anything to other adults because they knew her father and she was afraid there would be a "back lash" against her. She thought if she told someone, her father would find out and he would get in trouble or do something to hurt her, and people would think differently of her and not believe her.

When Doe was 14 years old, she finally told her father she would no longer engage in the sexual activity. This occurred when he asked her to go with him into the bedroom, which usually meant "something would happen"; she did not want to go; to try to coax her into the bedroom he grabbed her cat; she asked him for her cat back and hit him in the back; and she then told him she was not going to "do anything anymore" and she was "done with that kind of thing." After this, defendant stopped molesting her. Doe grew closer to her father again and felt safer, but in the back of her mind she worried and was afraid the molestation would resume. She and her father did not talk about the molestation but "just swept it under the rug and pretended" it was not there.

In 2008 or 2009, when Doe was about 16 or 17 years old, her mother moved out of the family home because her parents were getting divorced. Doe was allowed to choose which parent to live with, and she chose to live with defendant. Doe testified she was "very confused" about what she should do; she "just wanted to survive and be safe"; and she elected to live with defendant because the molestation had stopped and defendant was more financially secure than her mother.

However, there was one more incident in September 2009. While Doe and defendant were in the car in the desert, he masturbated in front of her. Doe

"looked away and pretended [she] wasn't there and tried to just get away from it mentally." She felt "upset and disgusted." Because of this incident and because she and her father were arguing a lot about her behavior, in October 2009 she moved in with her mother. As Doe was growing up, she told a few people about the molestation, including her cousin, her high school boyfriend, and two close friends. Doe's cousin and boyfriend testified to confirm the disclosure. In 2010, near the time when she was graduating from high school, Doe made a full disclosure during a long conversation with her high school boyfriend. During this time period she refused to continue visiting with her father, and after an emotional confrontation with her parents during a child custody exchange in a parking lot, she asked her mother to contact the authorities so she could talk to them.

Doe testified she felt relieved after finally disclosing the molestation; when she disclosed she was not living with her father and felt safer; but she still felt vulnerable because if her father "really wanted to do something, he would find a way." A child sexual assault expert testified that delayed disclosure of sexual abuse is a typical disclosure pattern for children. Regarding the long-term psychological impact of the molestation, Doe testified, "I have tried to forget a lot of the things about what has happened ... because it makes me feel a lot of things that I don't want to feel." She explained: "[I]t [is] very hard for me to feel kind of normal, and I feel more like there [are] some aspects of my life that aren't going to be normal, like my sex life with whoever I get married to is not going to be normal and that I am always going to have little triggers that make me remember what happened and stress me out or make me cry. I find it hard to actually speak with counselors about this kind of thing and people in general, but more so [with] counselors and therapists. I feel like I am very much going to have a lot of emotional and maybe psychological damage for the rest of my life from all of this."

*Defense*

The defense presented testimony from several witnesses (including a sheriff's deputy, a social worker, and defendant's mother, brother, and girlfriend) who had contact with Doe during her childhood. These witnesses variously testified that Doe never mentioned, and on occasion denied, any further molestation after defendant's 1998 conviction, and they did not observe anything to suggest defendant was continuing to molest Doe. The defense also called a psychiatrist who testified that unsubstantiated reports of child sexual abuse are more likely to occur when there are child custody disputes.

## STANDARD OF REVIEW

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). For purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

The AEDPA standard is highly deferential and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 100 (2011). For mixed questions of fact and law, federal habeas relief may be granted under the "contrary to" clause of § 2254 if the state court applied a rule different from the governing law set forth in Supreme Court cases, or decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v.*

3:16-cv-02650-BAS-KSC

*Cone*, 535 U.S. 685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* In other words, federal habeas relief cannot be granted simply because a reviewing court concludes based on its own independent judgment that the state court decision is erroneous or incorrect. *Id.* Habeas relief is only available under § 2254(d)(1) "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts" with Supreme Court precedents. *Harrington*, 562 U.S. at 101.

Where there is no reasoned decision from the state's highest court, a federal court "looks through" to the "last reasoned state-court opinion" and presumes it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the state court does not provide a reason for its decision, the federal court must conduct an independent review of the record to determine whether the state court's decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010). To be objectively reasonable, a state court's decision need not specifically cite Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court's decision will not be "contrary to clearly established Federal law." *Id.*

## DISCUSSION

Godwin raises eight claims in his Petition: (1) insufficient evidence to support a conviction of forcible sex acts; (2) insufficient evidence to support a conviction for aggravated sexual assault because the complaining witness could not recall one of the alleged sexual misconducts; (3) violation of Fifth and Fourteenth amendment due process rights in the admission of a prior conviction; (4) violation of due process rights under the Fifth, Sixth, and Fourteenth Amendments to a fair trial because a witness twice stated the petitioner fit the profile of a child molester; (5) improper denial of a request for release of jury information; (6) improper consideration of an un-*Mirandized* statement during sentencing; (7) imposition of $400,000 in damages when the complaining witness did not

8

ask for restitution; and, (8) cumulative error because of claims one through seven. [Doc. No. 1, at pp. 6-11; at pp. 9-22].

Respondent argues the following: claims one, two, five, seven, and eight are meritless; claim three is precluded; claim four has no basis for relief, or, in the alternative, constitutes harmless error; and, claim six is unsupported by precedent and thus harmless error. [Doc. No. 9-1, at pp. 13-49].

## A. Grounds One and Two Alleging Insufficiency of Evidence

Petitioner argues in Ground One that there was insufficient evidence for a conviction of forcible sex acts because no evidence supported coercive or forceful conduct. [Doc. No. 1, at p. 6]. Specifically, he contends there was insufficient evidence for the jury to make a finding of duress, which is defined as "the use of a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do [or submit to] something that he or she would not otherwise do [or submit to]." *Id.*; *See also People v. Soto*, 51 Cal.4th 229, 246, n. 9 (2011).

Petitioner argues in Ground Two that there was insufficient evidence to support a guilty verdict of aggravated sexual assault because the complaining witness was unable to independently recall the incidence of oral copulation. [Doc. No. 1, at p. 11].

### 1. Legal Standard

The California Supreme Court denied petitioner's request for appeal. [Doc. No. 10-77]. Therefore, this Court must "look through" the silent denial to the appellate court's reasoning to determine the grounds for relief. *Ylst*, 501 U.S. 804, n.3 (1991).

The Due Process Clause of the Fourteenth Amendment protects defendants from convictions "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he was charged." *In re Winship*, 397 U.S. 358, 364 (1970). During habeas review, a petitioner alleging insufficiency of evidence may obtain relief only if "it is found upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). "[T]he relevant question is whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Reversal on an insufficiency of evidence claim is, in essence, a "determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988)) (internal citations omitted).

The jury bears the burden of deciding "what conclusions should be drawn from evidence admitted at trial" and a habeas court can set aside a jury verdict on the ground of insufficient evidence *only if* no rational trier of fact could have agreed with the jury. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*). "The reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" by assuming that the jury resolved all conflicts in support of the verdict. *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). If the record supports competing inferences, the court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court applies the standard to the applicable state law that defines the elements of the crime. *Id.* at 324 n.16; *see also Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (*en banc*).

A further "layer of deference" exists under AEDPA. *Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005) (as amended). Habeas relief is not warranted unless "the state court's application of the *Jackson* standard [was] objectively unreasonable." *Id.* at 1274-75 n. 13 (internal citations omitted); *see also Cavazos*, 565 U.S. at 2 ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'") (internal citations omitted).

//

## 2. Analysis of Petitioner's Contention of Insufficient Evidence to Support A Jury Finding of Duress

The California Court of Appeal neither applied a standard contrary to Supreme Court precedent nor failed to identify the jury's conclusion as one with which no rational trier of fact could have agreed. *Cavazos*, 565 U.S. at 2.

California Penal Code Section 288(a) sets out the crime for lewd and lascivious acts, while subsection (b) provides additional penalties if the crime is committed with the use of, *inter alia*, force, duress, or fear of "immediate and unlawful bodily injury on the victim." Petitioner asserts that the evidence adduced at trial was insufficient to support a finding of duress under § 288(b) because the "conduct by [petitioner] [ ] was entirely unrelated to his sexual activity with the victim." [Doc. No. 1, at p. 10].

Petitioner takes issue, in particular, with the perceived reliance by the jury on Doe's testimony that she was afraid of petitioner due to his "tumultuous relationship with Doe's mother." [*Id.*]. Pointing to *People v. Soto*, he argues the jury finding of duress and subsequent upholding by the California Court of Appeal is inconsistent with the holding that "the language of section 288 and the clear intent of the Legislature [dictate] the focus must be on the defendant's wrongful act, not the victim's response to it." 51 Cal.4th 229, 246 (2011). Petitioner argues that because Doe did not testify any of his "behavior or words" were *"by design*, intended to scare Doe and impel her cooperation in the sexual misconduct[,]" the jury finding should be overturned. [Doc. No. 1, at p. 11] (emphasis added).

On direct appeal, the California Court of Appeal noted the element of duress allowed for a totality of circumstances analysis. [Doc. No. 10-8, at 11-12]; *See People v. Veale*, 160 Cal. App. 4th 40, 46 (2008). Specific factors may be considered in sexual misconduct cases when evaluating duress under California law, including: the age of victim, the relationship between the victim and the defendant, the relative size difference, and the age disparity. *Id.* Doe testified on more than one occasion she felt "grossed out" and uncomfortable during each act of misconduct. [Doc. No. 10-45, at pp. 6055, 6059-60,

6062]. Doe repeatedly testified she felt incapable of telling her father, "No." [*Id.* at 6059, 6074, 6096-97, 6104]. Of note, Doe stated:

> I was afraid that maybe word would get back to my dad, maybe *he would get me in trouble or something, hurt me, or do something to hurt me.* On top of that, I don't think I trusted people enough to share that kind of thing with. It was also information that made me very different about myself. I was always afraid of people knowing about it or maybe thinking something different about me.

[*Id.* at pp. 6096-97] (emphasis added). Moreover, Doe "described [petitioner's] volatile and at times violent behavior, including tying [both she and her] mother to the bed, throwing a chair, holding her mother in a headlock[,] and pulling the phone out of the wall." [Doc. No. 10-8, at p. 12].

Given the totality of evidence in the record from Doe's testimony, the Court of Appeal found sufficient evidence to support the jury's finding of duress, noting in support of its conclusion:

> The sexual abuse started when Doe was a small child and continued until she was finally able to assert herself enough to confront defendant at age 14. Doe testified she found the activity "gross," "disgust[ing]," and "upset[ting]," but she was too afraid of defendant to protest the molestation, and she worried if she told someone he might hurt her. She explained she did not know what he was capable of doing, and she described his volatile and at times violent behavior, including tying her mother and her to the bed, throwing a chair, holding her mother in a headlock and pulling the phone out of the wall.

[*Id.* at p. 12].

Thus the jury was well within its rights to "deduce that although [petitioner] may not have overtly forced Doe to engage in sexual activity, he psychologically coerced her by creating an atmosphere of fear within the family so that she would be intimidated, compliant, and secretive about the sexual activity." [*Id.* at 12-13]. This Court agrees with the Court of Appeal.

12

1   Petitioner's argument that *Soto* dictates this Court should find there was insufficient
2   evidence is inaccurate. The *Soto* court writes, "[b]ecause duress is measured by a purely
3   objective standard, a jury could find that the defendant used threats or intimidation to
4   commit a lewd act without resolving how the victim subjectively perceived or responded
5   to this behavior." *Soto*, 51 Cal.4th at 245-46. Doe testified to witnessing violent acts
6   throughout her childhood committed by petitioner and how those acts, in turn, instilled fear
7   in her. The jury was entitled to conclude from Doe's testimony that petitioner created an
8   environment in which Doe would remain quiet about any molestations for fear of violence
9   consistent with what she had previously experienced and witnessed. To the extent
10  competing inferences could be drawn from Doe's testimony, this Court presumes the jury
11  resolved any conflict in favor of the prosecution. *Jackson*, 443 U.S. at 326.

12  Petitioner further relies on *People v. Espinoza*, 95 Cal. App. 4th 1287 (2002) and
13  *People v.* Hecker, 219 Cal. App. 3d 1238 (1990). The *Espinoza* Court held that there was
14  insufficient evidence to support a finding of duress because "no evidence was introduced
15  to show that [the 12 year-old victim's fear of the defendant] was based on anything
16  defendant had done other than to continue to molest her." *Espinoza*, 95 Cal. App. 4th at
17  1321. The evidence adduced in *Espinoza* was that the defendant was victim's father, the
18  defendant was physically larger than her, and the victim was "limited intellectual[ly]." *Id.*
19  Without more, the *Espinoza* court found the evidence insufficient to support a § 288(b)
20  finding. *Id.* at 1321-1322. Similarly, in *Hecker*, there was no evidence the victim was
21  threatened by the defendant, nor did the victim testify she was afraid of the defendant.
22  *Hecker*, 219 Cal. App. 3d at 1250. Instead, the victim merely testified she "felt
23  'psychologically pressured' and 'subconsciously afraid'" of the defendant. *Id.* The
24  evidence in the record did not allow a fact finder to conclude even the bare minimum of an
25  "implied threat of force, violence, danger, hardship or retribution." *Id.* (internal citations
26  omitted).

27  Here, as noted above, Doe not only testified she was afraid of petitioner, but she also
28  testified to witnessing multiple instances when petitioner was physically violent in the

1  home. It was not unreasonable for a jury to conclude petitioner's actions furthered an
2  environment that would actively discourage Doe from speaking out about the molestations,
3  and fear the ramifications were she to do so. Again, while competing inferences might be
4  drawn from the evidence adduced, this Court "must presume – even if it does not
5  affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor
6  of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

7  Viewing the evidence in the light most favorable to the prosecution, and resolving all
8  competing inferences in favor of the existing resolution, it was not objectively
9  unreasonable for the California Court of Appeal to conclude that there was sufficient
10  evidence from which a rational juror could infer duress and convict Petitioner. *See* 28
11  U.S.C. § 2254; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

12  Accordingly, the Court **RECOMMENDS** this claim be **DENIED**.

13  **3. Analysis of Petitioner's Contention of Insufficient Evidence Due To Limited**
14  **Testimony Regarding an Incidence of Sexual Assault in Count One**

15  In claim two, Petitioner argues there was insufficient evidence to support his conviction
16  for aggravated sexual assault in Count One because Jane Doe could not recall specific facts
17  regarding the place and time of an incidence of oral copulation. [Doc. No. 1, at p. 11].
18  During the trial, Doe's recollection was refreshed using a transcript of the testimony she
19  had given in petitioner's prior trial. [Doc. No. 10-44, at p. 6079].

20  The California Supreme Court addressed, in *People v. Jones*, the issue of repeated acts
21  of molestation of a minor that are "essentially indistinguishable," and the inherent difficulty
22  in parsing individual instances of abuse over an extended period of time. 51 Cal.3d 294,
23  299-300 (1990). Testimony from a victim in such cases is adequate to support conviction
24  only when the victim is able to testify to (1) the kind of acts committed; (2) the number of
25  acts committed with sufficient certainty to support each of the counts alleged in the
26  information; and, (3) the general time period when the acts occurred. *Id.* at 316. In *Jones*,
27  the victim recalled multiple instances of oral copulation *only*, which occurred once or twice
28  a month at five locations. *Id.* at 322. The victim could not remember, nor did he testify to,

14

the "exact time, place, or circumstance of [the] assaults." *Id.* Rather, the charging document provided start and end dates for the periods during which the alleged acts occurred. The California Supreme Court held the jury findings of guilt were supported by the victim's testimony that the molestations "occurred during the periods specified in [the] four counts of the information." *Id.*

Upon review of an insufficiency of evidence claim regarding repeated sexual misconduct against a minor, courts look to the entire record to determine if a "rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Id.* at 314. All evidence is viewed in the light most favorable to the prosecution. *Id.*

Petitioner raises a number of arguments related to Doe's testimony, most of which turn on her inability to independently recall an act of oral molestation, and her inability to state with specificity the exact location and time of the molestation. [Doc. No. 1, at pp. 11-12]. Petitioner contends the Court of Appeal misapplied *Jones* and the jury needed to find the alleged act of oral copulation occurred (1) in the bedroom; (2) at the Cedar Street house; and, (3) between July 1, 2002, and November 19, 2003. [Doc. No. 12, at p. 7].

That Doe recalled the instance of oral copulation only after having her recollection refreshed with her prior testimony does not indicate there was insufficient evidence to support the jury finding. Petitioner cites no authority for the proposition that a witness whose recollection is refreshed from their prior testimony supports a finding of insufficient evidence. What petitioner, in effect, asks is for this Court to reevaluate the credibility of Doe's testimony. This is something that federal courts in habeas review have been explicitly prohibited from considering. *See Marshall v. Longberger*, 459 U.S. 422 (1983). Thus petitioner's argument regarding Doe's refreshed recollection is unavailing.

Petitioner's additional arguments are that Doe's testimony, and the evidence in the record regarding the incidence of oral copulation failed to meet the burden identified by the California Supreme Court in *Jones*. Petitioner both overstates and misstates the specificity of evidence required for the prosecution to meet its burden. As noted, *Jones* requires a victim testify to (1) the kinds of acts committed; (2) the number of acts

committed with sufficient certainty to support each of the counts alleged in the information; and, (3) the general time period when the acts occurred. *Jones*, 51 Cal.3d at 316. Doe clearly testified to the kind of act committed and the number of times the molestation occurred with respect to Count 1. [Doc. No. 10-45, at p. 6082]. The prosecution need not have produced evidence of the location of the charged molestation. That the prosecution decided to include the location of the molestation, the Cedar Avenue address, in Count 1 was not a required element under *Jones*:

> The fact that she could not recall in *which room* it occurred does not defeat the support for a finding that defendant engaged in oral copulation with Doe at the Cedar residence. Even though the information alleged the incident occurred in the bedroom, no such finding was needed to support the jury's verdict.

[Doc. No. 10-75, at p. 14]. Thus, the Court of Appeal's determination was correct.

Finally, Doe testified to the general time period when she lived at the Cedar Avenue residence. She recalled being nine to ten years old during that time. [Doc. No. 10-45, at p. 6055, 6084]. She also testified to living at the Cedar Avenue address for one year and that, upon moving to the Walnut Avenue address, she recalled being eleven years old and in the sixth grade. [*Id.* at 6053]. The prosecution decided to use the location of the molestation – the Cedar Avenue home – and the time frame during which the family lived there as the chronological reference point for Count 1. *Jones* is clear that the time frame need only be general. Moreover, the risk of the jury having convicted petitioner by relying on events charged in a different count are minimal because "the other allegations involved different locations, time periods, and/or sexual acts." [Doc. No. 10-75, at p. 15]. Doe recalled her age when the charged molestation occurred, and could not remember any other instance of oral copulation around that time. The Court of Appeal did not err when it determined a rational juror could do the simple math to determine how old Doe was when the family lived at different locations.

This Court defers to the factual determinations by the jury and can find no basis upon which to conclude the jury's conclusions were objectively unreasonable. *See Jackson*, 443

U.S. at 326. The Court of Appeal's rejection of petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established law.

Accordingly, the Court **RECOMMENDS** this claim be **DENIED**.

## B. Ground Three Alleging Improper Admission of Prior Conviction

In claim three, Petitioner alleges violations of his Fifth and Fourteenth Amendment due process rights because the trial court judge admitted evidence of the facts underlying his prior conviction of a sex offense against Jane Doe. [Doc. No. 1, at pp. 13-14].

### 1. Background re Admission of Propensity Evidence

Before petitioner's trial, the prosecution stated its intention to introduce detailed testimony of petitioner's prior conviction in 1998 – which included a confession – for molesting the victim in the instant case. [Doc. No. 10-42, at pp. 5904-05]. Petitioner opposed the admission of the specifics of the prior conviction arguing it was highly prejudicial:

> Again, your Honor, I would object. It is extremely prejudicial to my client, especially given the fact that we are going to stipulate that he has been previously convicted [of] a sex offense as to this particular victim. That admission of the prior, coupled with the detective's testimony, which is [ ] extremely prejudicial would not allow my client to have a fair trial. [California Evidence Code Section] 352 would urge that [the People's request be denied].

[*Id.* at p. 5905]. After considering the arguments from the prosecution and petitioner's counsel, the trial court ruled that the evidence would be admitted under California Code of Evidence § 1108[5]:

---

[5] California Evidence Code § 1108(a) states in pertinent part: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by section 1101, if the evidence is not admissible pursuant to Section 352." Cal. Evid. Code § 1108(a) (West 2009). Section 352 is the California Evidence equivalent of Federal Rule of Evidence 403, and states in pertinent part: "A court may, in its own discretion, choose to exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code. § 352 (West 2009).

And I think the way I look at it, the conviction is an admission that he did a touching. It could mean a lot of different things. That doesn't put any detail in front of the jury.

And the issue in 1108 -- and it is a statute that completely changed the dynamics of any type of a sex offense, whether it is a rape case or child molest, that basically the jury is now allowed to hear. And it's been upheld as constitutional, and the People are allowed to admit into evidence things that they never were before, and they are allowed to do it for propensity, to show that the defendant had a propensity to commit these types of acts.

So the only discretion the Court has is to make a determination as to whether or not under 352 of the evidence code, the Court should exclude it because the prejudicial value is outweighed by the probative value. And when you say "prejudicial value," it is not the fact that it hurts the defendant's case. It is things that would be prejudicial over and above the fact that it goes to show propensity.

And I don't see anything here that would be unduly prejudicial because the only reason it is being admitted is to show that he had this propensity or proclivity to touch the daughter in a sexual manner, and he admitted that.

It is really not contested. So I don't think it is going to take an undue or an inordinate amount of time. I think the best way to prove it is the defendant -- basically, he's telling the detective and I read the statement -- what he did. He describes what he did in his own words. So I don't think there's any question that that is the most accurate way of proving it is to let the defendant speak for himself. And in essence, that's what he's doing in this interview. And even though it is very harmful to the defense case, that is why it is admissible.

And I think under the 352 analysis, I can't consider the fact that it just hurts the defense case. I have to look at undue prejudice, things that any prejudice that would occur over and above the fact that it shows a propensity.

So I am not finding any significant undue prejudice in this case, and I don't think that the admission of the fact that he was convicted of it really wipes away the need for that type of evidence because the admission or the conviction doesn't really give details. It just admits that he committed that crime. It could be a one-time touching. It could be less than that. But I think his statements are more probative of the way that this evidence should come in.

18

1  So my decision, after evaluating all of the circumstances, is to allow
2  that evidence to come in. And the prior molestation of the same victim, using
   the defendant's words, and then also the admission, I think it should come in
3  on the fresh complaint.

4  [. . . .] And to the extent you find Ms. Stanford, the probation officer, I
5  have to know what she was going to say. I do remember reading the report.
   But if I remember correctly, in the probation report, he says things like "I
6  couldn't help myself."

7  And the reality is -- and he says some similar things in the interview
8  with Detective Crisp is that what he is saying that he has this propensity. He
9  is admitting his propensity with reference to, at least, her. And that really make
   it extremely probative, unfortunately, for your client. But that is the reality of
10 it. And there's nothing unduly prejudicial about that.

11
12 Now, does that mean he still has it today? Well, that's the issue in the
   case. And so you're going to have to refute that. That would be your position.
13
14 But I think I have to let it in, given the case law and the statutory law
   that requires it.
15

16 [Doc. No. 10-42, at pp. 5905-08]. Petitioner contends the trial court's decision is

17 unconstitutional because the evidence admitted "is so unduly prejudicial that it render[ed]

18 [his] trial unfair." [Doc. No. 1, at p. 14].

19 **2. Analysis**

20 "[The Supreme Court] has stated many times that federal habeas corpus relief does not

21 lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (internal citations

22 omitted). A habeas petitioner may not "transform a state-law issue into a federal one

23 merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389

24 (9th Cir. 1997). Instead, he must show that the state court decision "violated the

25 Constitution, laws, or treaties of the United States." *Little v. Crawford*, 449 F.3d 1075,

26 1083 (9th Cir. 2006) (quoting *Estelle*, 502 U.S. at 72 (1991)). Thus, a petitioner's

27 entitlement to habeas relief turns not on whether a state evidentiary law has been violated,

28 but whether the admission of the evidence "so infected the entire trial that the resulting

1    conviction violates due process." *Estelle*, 502 U.S. at 72 (internal citations omitted); *see*
2    *also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) ("[The federal court's] role
3    is limited to determining whether the admission of evidence rendered the trial so
4    fundamentally unfair as to violate due process.").

5        At present, no clearly established Supreme Court precedent has held that the admission
6    of propensity evidence violates the Constitution. *See e.g., Cogswell v. Kernan*, 645 Fed.
7    App'x 624, 627 (9th Cir. 2016); *Alberni v. McDaniel*, 458 F.3d 860, 863-64 (9th Cir. 2006).
8    Indeed, the Supreme Court expressly left the issue open regarding whether the admission
9    of propensity evidence constitutes a Due Process Clause violation. *Estelle*, 502 U.S. 62,
10   75 n. 5 ("[W]e express no opinion whether a state law would violate the Due Process Clause
11   if it permitted the use of prior crimes evidence to show propensity to commit a charged
12   crime."). Even were the Ninth Circuit to hold unconstitutional the admission of such
13   evidence, "[i]n cases where the Supreme Court has not adequately addressed a claim, [a
14   circuit court] may not use its own precedent to find a state court ruling unreasonable."
15   *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th. Cir. 2009) (*quoting Carey v. Musladin*,
16   549 U.S. 70, 77 (2006)). Notwithstanding the Supreme Court's prohibition, Ninth Circuit
17   precedent "squarely forecloses [the] argument" that admitting propensity evidence violates
18   the Due Process Clause. *Mejia v. Garcia*, 543 F.3d 1036, 1046 (9th Cir. 2008); *see also*
19   *Greel v. Martel*, 472 Fed. App'x 503, 504 (9th Cir. 2012). The Ninth Circuit considered
20   the issue in the context of Federal Rule of Evidence 414 – on which California Evidence
21   Code Section 1108 is based – and concluded "there is nothing fundamentally unfair about
22   the allowance of propensity evidence [so long] as the protections of Rule 403 remain in
23   place to ensure that potentially devastating evidence of little probative value will not reach
24   the jury." *U.S. v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001). In *LeMay*, the Court
25   determined that "[t]he evidence the defendant had sexually molested his cousins in 1989
26   was indisputably relevant to the issue of whether he had done the same to his nephews in
27   1997." *Id.* Finally, even if the evidence admitted was plainly prejudicial, that alone is
28   insufficient for habeas relief. *Holley,* 568 F. 3d at 1101 ("The Supreme Court . . . has not

yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Petitioner argues the trial court's admission of this prior conviction constitutes a Due Process Clause violation, and thus warrants habeas relief. The Supreme Court has not spoken to whether the admission of propensity evidence constitutes a Due Process Clause violation. Therefore, the Court of Appeal's decision to let the admission of evidence stand was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

Accordingly, the Court **RECOMMENDS** this claim be **DENIED**.

## C. Claim Four Alleging Prejudice from Inadmissible Opinion Testimony Heard By the Jury

In claim four, petitioner alleges a violation of his Fifth, Sixth, and Fourteenth Amendment rights due to two inadmissible statements made by prosecution witness, Detective Crisp, in the presence of the jury. [Doc. No. 1, at p. 9]. Petitioner contends the trial court erred as mistrial was "the only appropriate available remedy" given the "substantial prejudice" plaintiff suffered from the comments that were heard by the jury. [Doc. No. 12, at p. 15].

### 1. Background re Opinion Testimony

During the trial proceedings, the prosecution called Detective Crisp to testify to prior interactions with petitioner. [Doc. No. 10-45, at pp. 6239-6262]. Specifically, he provided testimony regarding his investigation of child molestation allegations in 1998 involving both petitioner and Jane Doe.[6] [*Id.* at p. 6241]. Petitioner takes issue with the following excerpts from Detective Crisp's testimony:

> Well, throughout the training and everything else, we – when you train in child molest cases, you have to go over prior cases and the profiles of a sexual predator and child molester, things like that. And throughout all of my

---

[6] The investigation of Detective Crisp was what led to petitioner's 1998 conviction, which was discussed earlier in this Report and Recommendation, Section B, *supra*.

interviews and interrogations, *I had never met someone sitting next to me that was the profile.*

[*Id.* at p 6242] (emphasis added).

Defense counsel objected on the basis that Detective Crisp's testimony inappropriately called for an expert witness opinion. [*Id.* at pp. 20-21]. The court sustained the objection, ordered the testimony stricken from the record, and admonished the jury to disregard what they heard. [*Id.* at 22-25].

Later, Detective Crisp testified to the following:

Well, I knew from the beginning that Mr. Godwin, the first few minutes of the interview, that he was fighting with himself whether to be there or not, whether to answer any questions or not. And that's why I reassured him that it was voluntarily. *I want to use the words that I used earlier that were thrown out, but he fit a profile.*

[*Id.* at 6261:6-12] (emphasis added). Counsel for petitioner, again, moved to strike and the court again sustained and further admonished the jury. [*Id.* at p. 13-17].

After Detective Crisp testified, counsel for petitioner moved off-record for mistrial. [Doc. No. 10-46, at pp. 6384-85]. The trial court denied the motion, reasoning:

The court will deny the motion for a mistrial and the testimony was stricken. If you request, you can prepare a specific instruction to remind the jurors that that testimony was stricken and to disregard it. I don't feel that the comments give rise to any – and it will not affect your client's ability to get a fair trial given the circumstances of the testimony and all of the things considered. There is a typical instruction that is given regarding striking of testimony and considering it for, you know – but if you want a pinpoint instruction on that, you are more than welcome to prepare that.

[*Id.* at p. 5-18].

In keeping with the court's prior statement on the record, the trial judge provided a specific instruction to the jury regarding Detective Crisp's stricken testimony, admonishing the jury to abide by the following:

During the testimony of prosecution, a witness, retired Detective Brad Crisp, I ordered portions of the testimony stricken from the record. You must

> disregard those portions of testimony and must not consider that testimony for any purpose.

[Doc. No. 10-47, at pp. 6675- 76].

Petitioner appealed from his conviction, arguing, *inter alia*, the denial of his motion for mistrial was inappropriate because of the stricken testimony from Detective Crisp. [Doc. No. 10-71, at p. 50]. The Court of Appeal rejected this argument, holding that Detective Crisp's statements about the defendant "fitting the profile" were not "so prejudicial that the effect of the testimony could not be cured." [Doc. No. 10-75, at 22].

Petitioner contends habeas relief is warranted because the trial court should have granted his motion for a mistrial[7] [Doc. No. 12, at 9] because Detective Crisp's stricken testimony was overly prejudicial. [Doc. No. 1, at p. 9] ("[P]rofile evidence is inherently prejudicial because it requires the jury to accept an erroneous starting point in its consideration of the evidence").

## 2. Legal Standard

It is well established that habeas relief is granted only where errors lie for violation of the Constitution, laws, or treaties of the United States. *See Estelle*, 502 U.S. at 68. State court decisions on state law are not typically a basis for such relief. *See id.* (A state error may rise to the level of a federal due process violation if it rendered the trial arbitrary or involved "fundamental unfairness"). Additionally, a habeas petitioner may not transform a state law issue into a federal claim just by claiming a due process violation. *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997). The admission or exclusion of evidence

---

[7] Upon review of both the Petition and Traverse, petitioner primarily argues that the testimony of Detective Crisp was overly prejudicial, thus warranting habeas relief. However, the heading for the relevant section of petitioner's Traverse reads: "Given That Crisp's Misconduct, [sic] Deprived Petitioner of a Fair Trial and Due Process, Mistrial Was the Only Available Remedy." [Doc. No. 12, at p. 9]. While not clearly stated, the Court construes the Petition and Traverse to argue the denial of his motion for mistrial by the trial court is an independent basis for habeas relief. The Court analyzes the two arguments in Section C, *infra*, due to the tight nexus between the trial court's handling of Detective Crisp's testimony and the subsequent decision to deny the motion for mistrial.

23

typically falls outside the scope of federal habeas relief. *See e.g.*, *Cogswell v. Kernan*, 645 Fed. App'x 624, 627 (9th Cir. 2016); *Tinsley v.* Borg, 895 F.2d 520, 530 (1990) (finding exclusion of proffered defense testimony was proper absent a prejudicial effect to warrant a due process violation).

The Supreme Court has made few rulings on evidentiary issues as a basis for violations of the Due Process Clause. Following *Estelle,* the Supreme Court denied certiorari in at least four different cases in which it might have further clarified the constitutional harms from the admission of propensity evidence. *See Alberni*, 458 F.3d at 866. The Ninth Circuit has read *Estelle* to dictate habeas relief for the admission of evidence only when "[the evidence in question] render[s] the trial fundamentally unfair." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995) (citing *Estelle*, 502 U.S. at 67-68). More clear, however, is the Supreme Court's approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." See *Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 689–690 (1986)).

Defendants have the right to an impartial jury that will return a verdict solely on the evidence produced at trial. *See Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). Yet where a trial court issues instructions or admonishments, a jury is also presumed to understand and follow the trial court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1989); *see also Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it ...").

### 3. Analysis

Petitioner argues that Detective Crisp's remarks, twice heard by the jury, could not be "unrung," regardless of the steps taken by the trial court. [Doc. No. 1, at p. 9]. Despite the trial court striking the testimony from the record, admonishing the jury to disregard what they heard, and issuing an instruction reminding the jury to disregard the testimony,

24

petitioner contends the jurors could not follow the cautionary instructions and the testimony was still considered and used in rendering the Petitioner's conviction. [Doc. No. 12, at pp. 9-10]. Thus, petitioner argues the properly excluded testimony had a prejudicial effect on the jury for which mistrial was the only appropriate remedy. [*Id.* at p. 9].

Petitioner raised this argument with the Court of Appeal, which disagreed. It determined the trial court did not abuse its discretion in denying the motion for mistrial. [Doc. No. 10-8, at p. 21]. The Court of Appeal opined:

> The record shows no abuse of discretion or deprivation of a fair trial based on the trial court's denial of the mistrial motion. The jury was repeatedly told to disregard any stricken testimony, and it was given a special pinpoint instruction to remind them to disregard Detective Crisp's stricken testimony.
>
> . . .
>
> We are not persuaded by defendant's contention that Detective Crisp's statements that defendant fit the child molester profile are so prejudicial that the effect of the testimony could not be cured. The trial court could reasonably assess that given the evidence properly presented to the jury, the profile statements were of minor significance. The jury knew that defendant admitted to molesting Doe when she was about five years old, and heard testimony to support that he resumed the molestation when Doe was about nine to 13 years old upon his return to the family home. Thus, the jury was presented with extensive evidence showing defendant's pattern of ongoing molestation.
>
> . . .
>
> [ ] Detective Crisp's references to a child molester profile were brief and nondescriptive, and the jury was quickly admonished not to consider them.

[*Id.* at pp. 21-22].

The Court of Appeal's determination is reasonable. A motion for mistrial should be granted only if a trial court reasons an admonishment or instruction would not suffice. *See People v. Collins*, 49 Cal.4th 175, 198 (2010). Incurability is inherently speculative, and trial courts are accordingly "vested with considerable discretion in ruling on mistrial motions." *Id.* And to the extent petitioner alleges the trial court's ruling regarding the denial of mistrial violated state law, habeas relief is unavailable. *See Wilson v. Corcoran,* 131 S.Ct. 13, 16 (2010) ("it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts"); *Estelle*, 502 U.S.

1  62, 67-78 (1991) (mere errors in the application of state law are not cognizable on habeas
2  review).

3  Here, the trial court not only struck the testimony from the record, but also issued
4  a further instruction when charging the jury. [Doc. No. 10-47, at pp. -6675-76]. Those
5  steps were appropriate methods to overcome the potential prejudice suffered by plaintiff
6  from Detective Crisp's testimony. Further, a jury is presumed to follow a trial court's
7  instructions, and this Court sees no basis to find the jury did not do so in petitioner's case.
8  *Weeks*, 528 U.S. at 234.

9  Petitioner relies primarily on two United States Supreme Court cases – *Bruton v.*
10 *United States*, 391 U.S. 123 (1968)and *Gray v. Maryland*, 523 U.S. 185 (1997) – to support
11 his contention that the admonishments and instructions were improper. Petitioner writes
12 in his traverse:

13       Petitioner quoted *Bruton* [ ] for the proposition that juries sometimes
14       cannot follow limiting instructions. Respondent, citing *Richardson v. Marsh*,
         418 U.S. 200 (1987) asserts that the jury is presumed to follow jury
15       instructions. [ ] However, as later recognized in *Gray v. Maryland* [ ] 'there
16       are some contexts in which the risk that the jury will not, or cannot follow
         instructions is so great and the consequences so vital to the defendant that the
17       practical and human limitations of the jury system cannot be ignored. *Gray* at
18       190 citing *Bruton* at 125.

19       Here, the jury could not help but credit Crisp's highly inflammatory
20       profile evidence, despite any instruction to the contrary.

21 [Doc. No. 12, at pp. 9-10].

22 Petitioner's reliance on *Bruton* and *Gray* is misplaced; neither case exhorts this
23 Court to grant habeas relief. The Supreme Court in *Gray*, characterized *Bruton* as follows:

24       *Bruton* involved two defendants accused of participating in the same
25       crime and tried jointly before the same jury. One of the defendants had
         confessed. His confession named and incriminated the other defendant. The
26       trial judge issued a limiting instruction, telling the jury that it should consider
         the confession as evidence only against the codefendant who had confessed
27       and not against the defendant named in the confession. *Bruton* held that,
28       despite the limiting instruction, the Constitution forbids the use of such a

26

confession in the joint trial.

523 U.S. at 188. The scope of *Bruton* was narrowed further in *Richardson v. Marsh*, in which the Court considered a redacted confession of a codefendant in a joint trial. 481 U.S. 200 (1987). The Court determined that the dictates of the Confrontation Clause are not violated "by the admission of a nontestifying codefendant's confession with a proper limiting instruction when [ ] the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.*at 211. The facts of *Gray*, like those of *Bruton* and *Richardson*, also pertain to redacted confessions of a codefendant in a joint trial. 523 U.S. at 188-89. Petitioner omits the context in which the Court made the pronouncement upon which he relies in his Petition and Traverse.[8] Neither *Gray* nor *Bruton* were cases in which the litigants sought habeas relief. Moreover, the testimony at issue and potential prejudice therefrom in those cases is substantially different from and

---

[8] For reference, this Court provides herein below the relevant portions of *Gray* that cite *Bruton* here:

This Court held that, despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial had violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses. [*Bruton v. United States*], at 137, 88 S.Ct., at 1628. The Court recognized that in many circumstances a limiting instruction will adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant. *Id.*at 135, 88 S.Ct., at 1627–1628. But it said:

"[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect.... The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination." *Id.*at 135–136, 88 S.Ct., at 1628 (citations omitted).

The Court found that Evans' confession constituted just such a "powerfully incriminating extrajudicial statemen[t]," and that its introduction into evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights. *Id.*at 135, 88 S.Ct., at 1627.

*Gray v. Maryland*, 523 U.S. 185, 190 (1998).

27

greater than the testimony here at issue. While petitioner is correct that there are circumstances in which the potential for prejudice is so great that "the practical and human limitations of the jury system cannot be ignored," the circumstances presented from Detective Crisp's testimony do not rise to the level contemplated in such Supreme Court precedent. *Id.*at 190.

Thus, for the reasons discussed above, this Court agrees the stricken testimony does not warrant habeas relief. Given the strength of the evidence, the defendants' admission to earlier molestation of Doe, the trial court's prompt admonishment, later instruction that counsel for petitioner was allowed to draft, and the jury's findings, the court concludes that any error the trial court may have committed in denying the mistrial motion based on Detective Crisp's testimony did not have a substantial and injurious effect on the jury's verdict. Petitioner is not entitled to habeas relief on this claim.

Accordingly, the state court's rejection of petitioner's claim was reasonable, and the Court **RECOMMENDS** this claim be **DENIED**.

## D. Ground Five Regarding Alleged Improper Denial of Release of Juror Information

Petitioner seeks habeas relief from the trial court decision to deny petitioner's request for juror information to determine the extent to which the alleged juror misconduct of one juror interfered with the jury or deliberation process. [Doc. No. 1, at p. 17].

The United States Supreme Court has yet to determine whether a state court rule limiting post-verdict contact with jurors can rise to the level of a federal constitutional violation. *See White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697 (2014) (holding that "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not 'clearly established at the time of the state-court decision'"), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004). "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

28

1  erroneously or incorrectly. . . . [r]ather, that application must be objectively unreasonable."

2  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal citations omitted).

3  However, the Supreme Court has addressed the potential Due Process Clause

4  violations associated with a trial court's failure to grant an evidentiary hearing to

5  investigate jury misconduct. *See Smith v. Phillips*, 455 U.S. 209, 102 (1982); *Remmer v.*

6  *United States*, 347 U.S. 227 (1954). In *Smith*, the defendant was convicted of two counts

7  of murder and one count of attempted murder. *Smith*, 455 U.S. at 210. Following the

8  verdict, the defendant learned a juror had applied for a position as a felony investigator

9  with the district attorney's office that prosecuted the case. *Id.* at 212. The defendant also

10 learned the existence of the application was made aware to the prosecution attorneys during

11 the trial, but they nonetheless chose not to bring it to the attention of the defense or the

12 court. *Id.* at 212-13. The trial court held a hearing after the defense filed a motion to set

13 aside the verdict, at which both the juror and prosecutors testified. *Id.* at 213. After the

14 hearing, the trial court denied the motion determining that, while the prosecution clearly

15 were wrong to withhold the information, the application did not suggest any inability to

16 remain impartial or premature assignation of guilt. *Id.* In describing the appropriate steps

17 the trial court took to investigate the matter, the Supreme Court explained:

18  Due process means a jury capable and willing to decide the case solely
19  on the evidence before it, and a trial judge ever watchful to prevent prejudicial
    occurrences and to determine the effect of such occurrences when they
20  happen. Such determinations may properly be made at a hearing like that
    ordered in *Remmer* and held in this case.
21

22 *Id.* at 217. Thus"[a]n evidentiary hearing is not mandated *every* time there is an allegation

23 of jury misconduct or bias." *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)

24 (emphasis in original); *see also United States v. Dutkel*, 192 F.3d 893, 894-95 (9th Cir.

25 1999) (holding that *Remmer* stands for the proposition that a hearing is mandated only in

26 those circumstances where jury tampering is at issue). The Ninth Circuit has more recently

27 clarified that habeas relief may be unavailing where a trial court engages in a mid-trial

28 interview of a potentially biased juror for any misconduct, determines the trial may proceed

29

1  with the jury as presently constituted, and subsequently issues a curative instruction.

2  *Tracey v. Palmateer,* 341 F.3d 1037, 1044-45 (9th Cir. 2003).

3      Petitioner presented this claim for review to the California Supreme Court, and to

4  the state appellate court on direct appeal. [Doc. No. 10-75, at pp. 10-77]. The California

5  Court of Appeal denied the claim on the merits in a reasoned opinion, and the state supreme

6  court summarily denied the petition for review without a statement of reasoning or citation

7  of authority. [*Id.*].

8      The Court will look through the silent denial by the state supreme court and apply

9  28 U.S.C. § 2254(d) to the appellate court opinion, *Ylst v. Nunnemaker,* 501 U.S. 797, 803-

10  06 (1991), which stated:

11          Defendant asserts the trial court erred by denying his posttrial request
            for identifying information for the jurors so his counsel could investigate
12          whether the jury was impacted by juror misconduct.

13

14          A. Background

15          1. Questioning of Juror No. 4 During Jury Deliberations

16          After the first day of jury deliberations (a Friday) and when the jury had
17          been dismissed for the weekend, two jurors stayed behind in court, indicating
            that they wanted to talk to the court. The court instructed the bailiff to tell
18          them to put their concerns in writing. Each juror wrote the court a note, stating
19          that Juror No. 4 had overheard the victim speaking to others in the hallway;
            Juror No. 4 was having difficulty being objective; and although Juror No. 4
20          was "trying his best to be honest [and] fair" he was finding it hard to "'unring
21          the bell.' "[FN 8] The court told counsel it would thank the two jurors for the
            notes and dismiss them for the weekend, and when the proceedings resumed
22          it would question Juror No. 4 to determine if he "has been compromised."
23          Defense counsel responded that he would like the court to also "inquire
            whether the jurors have been tainted if he made any comments other than he
24          can't be fair." The court stated it was "reluctant to get any detail, especially at
25          this juncture."

26          [FN 8] One note said: "During deliberations Juror 4 (I believe) had
27          overheard [Doe] speaking to others in the hall during the trial. Now he is
            having difficulty, it seems, being objective with the facts of what he heard. He
28

30

is trying his best to be honest and fair but has used the term 'finding it hard to unring the bell' when talking about it." The other note said: "One of the jurors has admitted to overhearing the victim speaking about the case in the hallway. He is struggling to remain objective during deliberation."

When the proceedings resumed on Monday, the court told counsel it would question Juror No. 4, and counsel could submit any questions to the court that they wanted the court to ask. When Juror No. 4 was brought into the courtroom, the court told him that it had received information that he may have "overheard something by ... [Doe] in the hallway," and asked if this was true. Juror No. 4 said that when he walked out of the jury room to get some water, he heard "one of the persons say, 'You should say this because he's going to say this.' Juror No. 4 then "turned right back around and went inside." The court asked, "So is that basically the extent of what you heard?" and Juror No. 4 answered yes. The court pointed out that the instructions tell the jurors to disregard anything they might hear from a party or witness other than when court is in session, and asked Juror No. 4 if he was "having any trouble disregarding it." Juror No. 4 responded, "No, not at all." Satisfied with this response, the court directed the jury to resume deliberations, including Juror No. 4.

The court told counsel that in its view the inquiry was sufficient; Juror No 4 was not troubled by what he inadvertently overheard and was following the instruction to disregard it; the court did not believe it was "in any ... way affecting the jury"; and if it did affect the jury it would be to the prosecution's detriment by suggesting someone was telling the complaining witness to say certain things that might not be true. When the court asked if there was any motion or other action it should take, both the prosecutor and defense counsel responded no. Defense counsel elaborated, "It just appears from Juror Number 4's statement that he didn't hear the substance of what was indicated. So I agree with the Court. I believe he can be fair."

2. Posttrial Request for Juror Identifying Information

After the jury returned its guilty verdict, defense counsel filed a motion requesting disclosure of the jurors' addresses and telephone numbers so he could interview them and determine if there were grounds for a new trial motion based on the juror misconduct reflected in the two notes from the jurors concerning Juror No. 4. Defense counsel stated it was never established who instructed Doe regarding what Doe should say, and he needed to interview the jurors to ascertain "exactly what transpired in the jury room,"

31

including information about how adamant Juror No. 4 was that he could not be fair, exactly what he told the other jurors he overheard, and how his statements impacted the ability of each juror and the jury as a whole to be fair.

The court denied the motion for release of juror identifying information, finding defendant had not made a prima facie showing of good cause for disclosure. The court stated its questioning of Juror No. 4 revealed no juror misconduct had occurred, and the "vague non-specific suppositions" of the other two jurors were "effectively put to rest" by the court's questioning of Juror No. 4, whom the court found to be credible. Further, defense counsel had the opportunity to submit questions to Juror No. 4, acknowledged that Juror No. 4 had not heard any substantive information, agreed that Juror No. 4 could be fair, and did not request further inquiry or that Juror No. 4 be removed.

B. Relevant Law

To protect a juror's right to privacy, a court is not allowed to release juror identifying information unless specific statutory requirements have been satisfied. (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 989-990.) The defendant must make a prima facie showing of good cause for disclosure, and if this requirement is met and there is no compelling reason against disclosure, the court must set the matter for a hearing where jurors can protest the disclosure. (Code Civ. Proc.,§ 237, subds. (b), (c).) To meet the initial prima facie burden, the defendant must make a "'sufficient showing to support a reasonable belief that jury misconduct occurred, ... and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.'" (*Carrasco*, *supra*, at p. 990; Code Civ. Proc., § 206, subd. (g); see *People v. Johnson* (2013) 222 Cal.App.4th 486, 497.)

The right to an impartial jury requires that the jury decide the case solely on the evidence adduced at trial and that it not be influenced by any extrajudicial communications. (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1115.) The existence of juror misconduct, including the inadvertent receipt of extrajudicial information, creates a rebuttable presumption of prejudice; the presumption is rebutted if the record shows "'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 397-398; *In re Hamilton* (1999) 20 Cal.4th 273, 295-296.) The likelihood of juror bias must be substantial; the courts do not reverse a jury verdict merely because there is some possibility a juror was improperly influenced. (*People v. Danks*

32

(2004) 32 Cal.4th 269, 305.)

If the record shows that investigation of alleged juror misconduct would not reveal anything prejudicial, the trial court may deny the petition for disclosure of juror identifying information. (*People v. Box* (2000) 23 Cal.4th 1153, 1222-1223.) On appeal, we defer to the court's credibility resolutions and review the court's disclosure ruling under the deferential abuse of discretion standard. (People v. Pride (1992) 3 Cal.4th 195, 260; *People v. Carrasco*, *supra*, 163 Cal.App.4th at p. 991.)

C. Analysis

Here, two jurors told the court that Juror No. 4 heard communications with Doe in the hallway, and although he was trying to be fair, he was struggling to be objective. The two reporting jurors did not indicate that Juror No. 4 had told any jurors the contents of what he overheard, and the two jurors made no suggestion that they, or any other jurors, had been exposed to information that affected their impartiality. Rather, their sole concern was with the difficulties of Juror No. 4. When the court questioned Juror No. 4, he assured the court he had disregarded the statements he had heard, and the court credited this assurance. When the court asked counsel if they wanted the court to do anything further, both counsel responded no, and defense counsel explicitly stated he thought Juror No. 4 could be fair.

From the information received from the two jurors who reported their concerns and the questioning of Juror No. 4, the trial court could reasonably assess that Juror No. 4 was not exposed to anything that ultimately overwhelmed his ability to be impartial. The court could deduce that the difficulties observed on Friday by the two reporting jurors were resolved by Juror No. 4 (who was reportedly trying hard to be impartial) by the time the court questioned him on Monday. This is supported by the fact that neither the prosecutor nor defense counsel expressed any concerns about Juror No. 4 after the court questioned him.

As to the matter of the jury's impartiality as a whole, the court could consider that if Juror No. 4 had conveyed any information to the other jurors that might have affected their ability to be fair, the two reporting jurors would have apprised the court of this concern given the diligence with which they reported their concerns about Juror No. 4. The failure of the two reporting jurors to raise any concerns about the impartiality of the jury as a whole supports that Juror No. 4's statements to the jury had no effect on anyone but

33

him. This conclusion is supported by the fact that although defense counsel initially requested that the court inquire about the impact on the other jurors, he did not renew this request after the court questioned Juror No. 4. Although defense counsel filed a posttrial motion seeking to further explore the matter, his failure to raise any concerns at the time Juror No. 4 was questioned suggests that Juror No. 4's demeanor and responses satisfied him that there had been no impact on the impartiality of the jury.

Although additional questioning of Juror No. 4 and/or other jurors would have been helpful to create a more complete record, the court and counsel's handling of the matter revealed sufficient information to rebut the presumption of prejudice arising from Juror No. 4's exposure to extrajudicial information. The court reasonably found that defendant did not make a prima facie showing of prejudicial juror misconduct, and accordingly did not abuse its discretion in denying the request for disclosure of juror identifying information.

[Doc. No. 10-75, at pp. 23-29].

The Court defers to the trial judge's determination that the only juror who was exposed to the post was able to remain impartial. *See Miller v. Fenton*, 474 U.S. 104, 114 (1985) (holding that a state trial judge is in a far superior position to assess juror bias than federal habeas judges); *see also Austad v. Risley*, 761 F.2d 1348, 1350 (9th Cir. 1985) ("The Supreme Court has clearly established that the determination of a juror's partiality or bias is a factual determination to which section 2254(d)'s presumption of correctness applies."), citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). In *Palmateer*, as in the present case, the Court interviewed a juror to determine if the conversation he overheard jeopardized their ability to remain objective. *Palmateer*, 341 F.3d at 1038-39. By contrast, however, defense counsel in *Palmateer* strenuously objected to the trial continuing and moved for a mistrial. *Id.* Petitioner's counsel raised no such similar objection before the trial court following the court's examination of the witness. [Doc. No. 10-75, at p. 24]. The trial court in this case was neither required to hold an evidentiary hearing, nor to grant petitioner's request for juror information in light of the earlier rulings.

Moreover, this Court agrees with the Court of Appeal's well-reasoned analysis of the facts and conduct of the trial court. The Court of Appeal accurately notes that no juror

ever expressed concern over the impartiality of the jury as a whole. [*Id.* at 28]. This Court finds that petitioner has failed to demonstrate that the state court adjudication of this claim is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts.

Accordingly, this Court **RECOMMENDS** this claim be **DENIED**.

## E. Claim Five Re Sentencing Court's Consideration of Evidence Excluded at Trial on *Miranda* Grounds

Petitioner argues he is entitled to a new sentencing hearing due to violations of his Fifth and Fourteenth Amendment rights from the sentencing court's consideration of a "non-*Mirandized*" statement he made to a correctional officer. [Doc. No. 1, at pp. 18-19]. Petitioner cites no caselaw in support of his contention that habeas relief is warranted for the court's use of the non-*Mirandized* statement other than *Miranda v. Arizona*, 384 U.S. 436 (1966). Respondent cites to *White v. Woodall,* 134 S. Ct. 1697, 1705 (2014), in a conclusory fashion for the proposition that grounds for relief are not clearly established.

### 1. Background

During Petitioner's sentencing hearing, his mother, Judith Rippetoe, spoke to the court in his defense. [Doc. No. 10-52, at pp. 7072-76]. She stated petitioner pled guilty to the molestations in 1998 to ensure any charges against his wife, Alma Godwin, would be dismissed. [*Id.*at 7072]. She further claimed, *inter alia*, Ms. Godwin "turned her children against their father" and "is very capable [at] brainwashing people into believing what she wants them to." [*Id.*]. In sum, Ms. Rippetoe asserted petitioner never committed the acts for which he pled guilty in 1998, nor the acts in the present case from which he lodges the instant Petition. [*Id.*at pp. 7074-75].

Following Ms. Rippetoe's statements, the sentencing court noted it was permitted to consider a statement deemed inadmissible at trial for a *Miranda* violation. [*Id.*at pp. 7077-80]. The prosecution argued for the court to consider the statement made by petitioner to Correctional Officer Pope:

> And I would ask the Court to consider that statement. When he was

35

booked into county jail, he was being interviewed by Correctional Officer
Pope, and Correctional Officer Pope testified in a 402 hearing in the first trial,
and he stated that he was getting his information to know where to place him
inside the jail, and at one point this Correctional Officer Pope said, "Did you
do it?" And he said, "Yes, and I even brought in the dog."

Correctional Officer Pope got mad. He testified he got upset, and he
had to stop the conversation because he could feel himself getting upset at the
defendant.

And so I would ask you to consider that with all of the other evidence
presented at trial, understanding why it was not allowed in trial at the time. It
was a violation of his Miranda rights.

[*Id.*at 7077-78]. The sentencing court then explained the basis upon which it could
consider the statement made by petitioner:

I will state that to the extent that I can consider the testimony that was
not allowed at trial, I would only be considering that on the issue of the
credibility of the statement that he didn't do it or that it wasn't true, not for the
truth of the matter.

As far as the crimes where the jury found the defendant guilty, what I
am considering is the evidence that was presented at trial, and so I am not
going to consider the un-Mirandized statement as proof that he did or did not
commit the offenses.

I think the evidence at trial speaks to that significantly enough. But I
will consider it for purposes of credibility as to the statements made regarding
Ms. Rippetoe and then leave it at that.

[*Id.*at p. 7080-81].

The court subsequently sentenced petitioner to a term of 334 years to life [*Id.*at p.

7124] after providing a lengthy rationale, portions of which are excerpted below:

All right. As far as the sentencing is concerned, this case covers almost
two decades of time period, actually more than two decades in people's lives.

It has a tortured history from the Court's observation and understanding
of the case, and I did, during the course of the trial, I looked at the records and

36

the pleadings as well as issues regarding what happened in the first case, because it related to the second case, based upon evidentiary issues that were applicable to the second case specifically, and primarily the statement from the testimony regarding what the Court characterized as a confession made by Mr. Godwin in the 1998 case to Detective Crisp.

And then Detective Crisp after the Court and both counsel litigated the admissibility of that, the Court found that that was admissible evidence, and the record is very clear as to what the Court's reasoning was for that.

But it is very clear to the Court that Mr. Godwin molested the victim in this particular case, [Doe], as it relates to the 1998 case.

And it is not just his plea that he entered into in 1998. It was his confession where he voluntarily went to the police department and gave a very detailed statement that was, although the recording was lost in the interim years, there was a transcript made at the time, a verbatim transcript that survives. The Court has reviewed that. Detective Crisp testified to the contents of that interview, and it was very clear that the import of that was that Mr. Godwin admitted significant acts of child molestation to the same victim, who is the victim in this case.

He entered a plea. He pled guilty. And he received treatment through health professionals to try to alleviate the issues that caused him to molest the victim in the 1990s when she was five years of age and younger.

Essentially the victim doesn't even remember those events because of either the passage of time or the emotional harm that was caused by that, but nonetheless, she may have disclosed it initially, but the bottom line is that we know it occurred. And it occurred in much more significant, on a number of occasions based upon the statements made by Mr. Godwin.

And the import of what Detective Crisp testified to in my own review of the transcript of that in connection with the motion hearing, in hearings regarding the admissibility of that, that is basically what Mr. Godwin was saying was he couldn't help himself, that he was, had it within him to have the urges to molest children.

And he was asking for help at the time, and we all know the history of what occurred thereafter, is that the district attorney's office is filing charges against Mr. Godwin, he entered into a plea agreement where he pled to one

count.

[ .... ]

I don't find that was the case. Looking at all the evidence, there is really overwhelming evidence that in 1998, in that decade that he molested Doe. We have his own confession to Detective Crisp. We have his plea which is another confession or admission that he did that.

We have the independent statements he made to his probation officer, and then we also have the statements that he made to the treating mental health professional to that effect, and he did all of that voluntarily.

The testimony regarding the statement to Detective Crisp was that he voluntarily went to the police department and told about his problem, as he characterized it. And he received a tremendous benefit from that cooperative effort that he had.

[ .... ]

He's been convicted of seven separate offenses by this jury, this Court heard testimony on, and I would characterize the molestations which the jury found the defendant guilty on, the amended count applicable to the jury's verdict counts 1 through 7, is that the -- or the seven counts as found by the jury is that they were, by any sense, they were horrific acts by somebody who was clearly and unquestionably a child molester, who could not or would not be helped, and that was the conduct. That's the way I called the conduct.

So to the extent Mr. Godwin's family members, and they -- I don't doubt that they believe what they are saying. They are just wrong.

*They are just wrong as to whether or not he is a child molester, whether or not he's committed these acts.* It is clear to the Court and it was clear to the jury that Mr. Godwin molested his own daughter repeatedly, that he did it over a significant period of time in different locations, that he knew what he was doing, he planned out many of them, not all of them, and he did it repeatedly for his own sexual gratification.

The nature of the molestations was horrific, and there was even testimony of an animal involved, and it just doesn't get worse than the conduct that Mr. Godwin engaged in in this particular case.

Each of the facts that were found true by the jury that the Court is going to sentence on, they were all separate. They were spaced in some cases by extended periods of time. It wasn't like one incident where there were multiple acts on one occasion. There was actually probably many, many actions, but only one was charged for each block of time.

So the acts that the jury found true and beyond a reasonable doubt were just one of many that he engaged in for a period of many, many years.

I do find that given all the evidence in the case, including the statements made by Mr. Godwin in the 1998 case that were admitted before the jury in this trial, as well as considering all of the evidence that was presented during the course of the trial including the victim's testimony, that the acts were committed.

There's no question in the Court's mind that they are, they were true, that he was properly convicted. The victim was very credible as far as her telling what she could about when they occurred.

[*Id.*at pp. 7082-89] (emphasis added).

## 2. Legal Standard For The Application of Supreme Court Precedent to A Particular Set of Facts

The Supreme Court has rejected what it termed the "unreasonable-refusal-to-extend" rule where a state court could be deemed to have erred under ADEPA if it "unreasonably refuse[s] to extend a legal principle to a new context where it should apply." *White v. Woodall*, 134 S. Ct. 1697, 1705 (2014) (internal citations omitted). By definition, a rationale is not clearly established if a habeas court must "*extend* a rationale [ ] to apply it to the facts at hand." *Id.*at 1706 (emphasis added). Section 2254(d)(1) does not require an identical fact pattern for a legal rule to apply, but "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility* for fairminded disagreement on the question." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (emphasis added). Indeed, "an 'unreasonable application' of those holdings

39

must be 'objectively unreasonable', not merely wrong; even 'clear error' will not suffice." *White*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Put differently, "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Yarborogugh v. Alvarado*, 541 U.S. 652, 666 (2004). As discussed in greater detail, *infra*, petitioner's arguments would ultimately require this Court to "extend" federal law, rather than "apply" it. And while a persuasive argument can be made for petitioner's position, the determination by the trial court and Court of Appeal were not "so lacking in justification" that there was no "possibility for fairminded disagreement on the question." *Harrington*, 562 U.S. at 103.

### 3. Determining Clearly Established Supreme Court Precedent Regarding a Sentencing Court Considering Non-*Mirandized* Statements

The instant question for petitioner's claim for habeas relief is whether the sentencing court's consideration of the non-*Mirandized* statement made to a correctional officer violated petitioner's constitutional rights. Specifically, whether the decision by the California Court of Appeal was contrary to clearly established federal law as interpreted by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Only if there exists a constitutional violation of Supreme Court precedent must this Court then engage in an analysis for harmless error. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). No Supreme Court case explicitly addresses this question. Most relevant are a series of cases addressing the appropriateness of considering non-*Mirandized* statements at a sentencing hearing in a capital case, and the kinds of inferences that can be appropriately drawn from a defendant's decision not to testify at their sentencing hearing. *See Carter v. Kentucky*, 450 U.S. 288 (1981) (holding that if a defendant chooses not to testify, he has the right to a no adverse-inference instruction during the guilt phase of a trial); *Estelle v. Smith*, 451 U.S. 454 (1981); *Mitchell v. U.S.*, 526 U.S. 314 (1999); *White v. Woodall*, 134 S. Ct. 1697 (2014).

In *Estelle*, the matter before the Court was whether the introduction of an involuntary and non-*Mirandized* pretrial psychiatric examination at the sentencing phase of petitioner's

capital murder case violated his right against self-incrimination under the Fifth Amendment. The Court found "no basis to distinguish" between the phases of "a capital murder trial," and "[g]iven the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." *Estelle*, 451 U.S. at 463. Determining that the state could not rely on the non-*Mirandized* statements for purposes of demonstrating "future dangerousness" – a required element to sentence petitioner to death under Texas law – the Court affirmed the district and appellate court's decisions to grant the writ. *Id.*at 468.

The Court later expanded the holding of *Estelle*, explaining that "[a]lthough *Estelle* was a capital case, its reasoning applies with full force [in the non-capital case] here, where the Government seeks to use petitioner's silence to infer commission of disputed criminal acts." *Mitchell*, 526 U.S. at 329. The question before the *Mitchell* Court was whether a sentencing court could draw an adverse inference from a defendant's silence when determining facts that might impact the severity of a defendant's sentence. *Id.*at 317. The petitioner pled guilty to four counts of drug distribution: one count for distribution of five or more kilograms of cocaine, and three counts for distribution of cocaine within 1,000 feet of a school or playground. *Id.* The plea did not specify a sum-certain of distributed cocaine, leaving the amount to be determined at the sentencing hearing. *Id.* At sentencing, petitioner proffered no evidence, nor did she testify to counter the government's contentions about the quantity of drugs distributed. *Id.*at 319. "[The] Petitioner faced imprisonment from one year upwards to life, depending on the circumstances of the crime" which were left to be determined at the sentencing stage of the case. *Id.* at 327. The district judge used the petitioner's decision not to testify as basis to draw conclusions that negatively impacted her. *Id.* The court of appeals upheld the district court and the Supreme Court reversed and remanded. *Id.* The Court "decline[d] to adopt an exception for the sentencing phase of a criminal case with regard to factual determinations *respecting the circumstances and details of the crime.*" *Id* at 328 (emphasis added). A sentencing court cannot rely on a defendant's decision not to testify at a sentencing hearing to draw an adverse inference

regarding a fact or detail of the crime for which a defendant is charged if the fact or detail would serve to exacerbate the defendant's punishment.

In *White v. Woodall*, the Supreme Court carefully parsed *Carter, Estelle,* and *Mitchell*, clarifying that habeas relief is *not* warranted where a state sentencing court fails to issue a no-adverse-inference instruction in the penalty phase of a capital case. 134 S. Ct. at 1702. The petitioner pleaded guilty to capital murder, capital kidnapping, and first-degree rape. *Id.* at 1701. He did not testify during the sentencing portion of his case and he requested a *blanket* no-adverse-inference instruction," which the court denied. *Id.* at 1704. The Court reasoned that the Kentucky Supreme Court's conclusion was "not contrary to the actual holding of [*Carter, Estelle*, or *Mitchell*]." *Id.* In its analysis, the majority explained how then-existing Supreme Court precedent was not so clear as to preclude "any possibility for fairminded disagreement." *Id.* at 1703 (quoting *Harrington*, 131 S. Ct. at 787).

First the majority turned to *Mitchell*, reasoning the *Mitchell* Court's holding that adverse inferences regarding "factual determinations respecting the circumstances and details of the crime," *Mitchell*, 526 U.S. at 328, necessarily "leaves open the possibility" for some types of permissible inferences. *White*, at 1703. The Majority further notes the *Mitchell* Court made an express reservation: "whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of [a] downward adjustment . . . is a separate question . . . not before us, and we express no view on it. *Mitchell*, at 328. The Court emphasized the reservation for two reasons: (1) "if *Mitchell* suggests that *some* actual inferences might be permissible at the penalty phase, it certainly cannot be read to require a *blanket* no-adverse-inference instruction at every penalty phase"; (2) to the extent any adverse inferences could be drawn from petitioner's silence, they would fall within the class of inferences appropriate under *Mitchell* because petitioner pleaded guilty to all charges, including aggravating circumstances. *Id.* at 1704. In a case where "every relevant fact on which [the state bears] the burden of proof [is established,] there are reasonable arguments that the logic of *Mitchell* does not apply." *Id.* The facts of

42

*Estelle* did not involve an adverse inference from a defendant's silence, but rather whether a non-*Mirandized* statement could be submitted to a jury at the sentencing phase of a capital trial. Therefore, "whatever *Estelle* said about the Fifth Amendment", it does not demand no-adverse-inference instructions in all cases at sentencing. *Id.*at 1704.

Justice Scalia, writing for the *White* majority concluded:

> Perhaps the logical next step from *Carter, Estelle,* and *Mitchell* would be to hold that the Fifth Amendment requires a penalty-phase no-adverse-inference instruction in a case like this one; perhaps not. Either way, we have not yet taken that step, and there are reasonable arguments on both sides— which is all Kentucky needs to prevail in this AEDPA case. The appropriate time to consider the question as a matter of first impression would be on direct review, not in a habeas case governed by § 2254(d)(1).

*Id.*at 1707. Since the Kentucky Supreme Court's rejection of petitioner's arguments were not unreasonable, the United States Supreme Court did not turn to address whether the trial court's "putative error" was harmless. *Id.*

Should this Court determine the sentencing court erred, however, harmless error analysis will be necessary. All federal constitutional errors do not "automatically require reversal of a conviction." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). Two types of constitutional errors exist: structural error and trial error. Structural error implicates constitutional precepts so fundamental to a fair trial that infraction could never be seen as harmless (e.g., deprivation of counsel or the denial of a trial by an impartial judge). *See Chapman v. California,* 386 U.S. 18, 23 (1967). Structural errors requires automatic reversal. *See Fulminante*, 499 U.S. at 290. All other errors are trial errors and can "quantitatively [be] assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 306. Only when an error has a "substantial and injurious effect" on the verdict may habeas relief be granted. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (citing to *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

//

### 4. Whether A Non-*Mirandized* Statement May Be Heard at a Sentencing Hearing in a Non-Capital Case is Clearly Established Supreme Court Precedent

Petitioner argues the sentencing court's determination that "the statement was harmless beyond a reasonable doubt was an unreasonable determination of the facts in light of the record and an unreasonable application of *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)]." [Doc. No. 1, at p. 19]. His argument turns on the assertion that Ms. Rippetoe's credibility as to petitioner's innocence "was irrelevant for any purpose that should have influenced a decision to impose multiple consecutive terms." [*Id.*]. Thus he contends the sentencing court's consideration of the non-*Mirandized* statement in any capacity "violated petitioner's right to Due Process" warranting a new sentencing hearing. [*Id.*].

Respondent rejoins on two grounds. [Doc. No. 9-1, at pp. 44-45]. First, that petitioner failed to identify any Supreme Court precedent to support his contention that *Miranda* applies "in a sentencing hearing in a non-capital case." [*Id.* at p. 44]. Second, even assuming there was constitutional error, "any error was clearly harmless beyond a reasonable doubt" as determined by the California Court of Appeal. [*Id.*]. The Court turns first to the question of whether the right was clearly established as petitioner contends. Whether any error was harmless is addressed in sub-section five, *infra*.

Petitioner presented this claim for review to the California Supreme Court, and to the state appellate court on direct appeal. [Doc. Nos. 10-75, 10-77]. The California Court of Appeal denied the claim on the merits in a reasoned opinion, and the California Supreme Court summarily denied the petition for review without a statement of reasoning or citation of authority. [*Id.*]. The Court will look through the silent denial by the California Supreme Court and apply 28 U.S.C. § 2254(d) to the California Court of Appeal opinion, *Ylst*, 501 U.S. at 803-06, which "[a]ssum[ed], without deciding, that at sentencing the court could not properly consider defendant's non-*Mirandized* admission to the correctional officer." [Doc. No. 10-75, at p. 32]. The Court of Appeal did note, however, that "there is case authority indicating a sentencing court in a noncapital case may in some circumstances

properly consider a defendant's non-*Mirandized* statements." [*Id.* at p. 32 n. 10]. Assuming a violation existed, the Court of Appeal offered no extended discussion for its reasoning and quickly turned to the question of harmless error. [*Id.* at p. 32].

Upon review of existing Supreme Court precedent, this Court finds the Court of Appeal erred in assuming a *Miranda* violation arose from the sentencing court's consideration of petitioner's statement to Correctional Officer Pope. The existing caselaw regarding the question of a sentencing court's consideration of a non-*Mirandized* statement at a sentencing is not "contrary to, or [ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

To agree with the Court of Appeal, this Court would need to read *Estelle* and *Mitchell* together using a mode of legal analysis similar to what the Supreme Court expressly rejected in *White v. Woodall.* 134 S. Ct. at 1707. *Estelle* stands for the proposition that a non-*Mirandized* statement introduced in the penalty phase of a capital case constitutes a violation of one's right against self-incrimination under the Fifth Amendment. 451 U.S. at 462. *Mitchell*, in turn, stands for the proposition that a defendant has a Fifth Amendment right to be free from adverse inferences regarding the factual details and circumstances of a crime at the sentencing phase of a non-capital case. 526 U.S. at 329. Where "every relevant fact on which [the state bears] the burden of proof [is established, however,] there are reasonable arguments that the logic of *Mitchell* does not apply." *White v. Woodall*, 134 S. Ct. at 1704. To find the sentencing court violated petitioner's Fifth Amendment rights, this Court would have to read *Estelle* and *Mitchell* to dictate that a sentencing court's consideration of petitioner's non-*Mirandized* statement in a non-capital trial where "every relevant fact on which the state [bore] the burden of proof [was established]" – as it was here – violates the Fifth Amendment. *Id.* While a strong argument can be made in favor of petitioner's contentions, the Supreme Court has "not yet taken that step, and there are reasonable arguments on both sides." *White* at 1707. The reasoning of the Court of Appeal was cursory, at best, and ultimately "[t]he appropriate

45

time to consider the question as a matter of first impression would be on direct review," not in the context of AEDPA. *Id.* To the extent petitioner seeks habeas relief under § 2254(d)(1), the Court finds that Supreme Court precedent is not "beyond *any* possibility for fairminded disagreement on the question." *Harrington* 562 U.S. at 103 (emphasis added).

Therefore, the Court **RECOMMENDS** petitioner's claim for relief insofar as it asserts the Court of Appeal violated clearly established Supreme Court precedent be **DENIED**.

### 5. Harmless Error Analysis

Petitioner further asserts that the Court of Appeal's harmless error analysis was misguided and overlooked an unreasonable sentencing decision by the lower court. [Doc. No. 1, at p. 19]. Respondent contends the sentencing decision would have been identical had the court not admitted the non-*Mirandized* statement. [Doc. No. 9-1, at p. 44]. In an abundance of caution, this Court reviews the Court of Appeal's decision for harmless error, despite the finding discussed in Section D, 4, *supra.*

The Court will look through the silent denial by the California Supreme Court and apply 28 U.S.C. § 2254(d) to the Court of Appeal's decision, which stated:

> Assuming, without deciding, that at sentencing the court could not properly consider defendant's non-*Mirandized* admission to the correctional officer, the record shows defendant's incriminating statements to the correctional officer were of minimal consequence at the sentencing hearing; hence, any error was harmless beyond a reasonable doubt. (*People v. Thomas* (2011) 51 Cal.4th 449,498 [harmless beyond a reasonable doubt standard applies to Miranda error at penalty phase of capital case].) [FN 10]. The court emphasized that it was considering the non-*Mirandized* admission for the narrow purpose of evaluating the credibility of defendant's mother's belief that defendant was innocent. When the court explained the reasoning underlying its sentencing decisions, it focused on the evidence presented at trial and other matters properly before it. *The court delineated its view of the trial evidence, found Doe to be credible, and concluded defendant's guilt was clearly established.*
>
> [FN 10] Although we need not decide the issue, we note there is case

46

authority indicating a sentencing court in a noncapital case may in some circumstances properly consider a defendant's non-*Mirandized* statements. (*United States v. Graham-Wright* (6th Cir. 2013) 715 F.3d 598, 601-604; *People v. Petersen* (1972) 23 Cal.App.3d 883,896; *see generally White v. Woodall* (2014) _U.S._ [134 S.Ct. 1697, 1703] [although privilege against self-incrimination applies at penalty phase, it may not apply in the same manner as at guilt phase].

We have no doubt the court's sentencing decision would have been the same even without consideration of defendant's admission to the correctional officer. There is no basis for reversal of the sentence on this ground. [FN 11].

[FN 11] Given our holding, we need not evaluate the People's contention of forfeiture concerning this issue.

[Doc. No. 10-75, at pp. 32-33] (emphasis added).

This Court agrees with the Court of Appeal's determination. In its statements on the record, the sentencing court focused exclusively on the volume of evidence introduced in the case at trial, and the findings of guilt on all counts by the jury. The statement the court considered effectively spoke to two issues: (1) an admission of guilt, and (2) that petitioner had in some way involved an animal in one instance of molestation. [Doc. No. 10-52, at p 1077]. When conducting a harmless error analysis, a court must evaluate whether the purported error "had substantial and injurious effect or influence in determining the jury's influence." *Brecht v. Abrahamson*, 507 U.S. 623, 637 (1993). Given that this is a sentencing hearing, the more appropriate standard is articulated by the Supreme Court in *Apprendi v. New Jersey*, which requires a court "consider the evidence presented at sentencing hearings," 530 U.S. 466, 647 (2000), and determine whether "a judge was presented with sufficient documents at sentencing—including the original conviction and any documents evidencing a modification, termination, or revocation of probation—to enable a reviewing or sentencing court to conclude that a jury would have found the relevant fact beyond a reasonable doubt." *Butler v. Curry*, 528 F.3d 624, 647, n. 14 (2008). Error under *Apprendi* exists when a sentencing court considers a fact not submitted to the

jury "that increased the penalty for a crime beyond the prescribed statutory maximum". *Id.*at 490. No such error exists here.

First, the two "facts" arguably contained in the admitted statement were not at issue. Petitioner had been convicted on all counts for which he was tried when presented before the sentencing hearing. Thus to the extent the court relied on the statement in question for any purpose beyond that contained in the record – to weigh the credibility of Ms. Rippetoe's testimony regarding petitioner's total innocence – the statement established no new fact. Petitioner was convicted of the charged crimes by a jury. Second, the jury had also heard testimony regarding the contention petitioner tried to incorporate an animal into an act of molestation. The victim, Doe, testified to the event[9] and the jury found petitioner guilty of the crimes charged pertaining to the relevant time period. [Doc. No. 10-48, at pp.

---

[9] The portion of the trial testimony from Doe is excerpted below:

> [Prosecutor]: Do you remember anything else of a sexual nature happening at 930 Walnut?
>
> [Doe]: There was a time he brought a dog in the house.
>
> Q: Tell me about that.
>
> A: I don't remember exactly what was said. But I remember he wanted me to get down on all fours, and he wanted to put the dog on top of me and put the dogs penis in -- I don't know where, but he wanted the penis to go somewhere.
>
> Q: And where did this happen?
>
> A: In the bedroom, master bedroom.
>
> Q: And do you remember if anything happened after you got on all fours?
>
> A: I don't – I think I said no, and I didn't end up getting on all fours. And I think if I remember correctly, he had the dog get on top of him instead.
>
> Q: Did he do anything when the dog got on top of him?
>
> A: I don't remember exactly what happened after that. I just remember I was really grossed out.

[Doc. No. 10-44, at pp. 6061-62].

3:16-cv-02650-BAS-KSC

6814-19]. Thus, it was not the first time the court was apprised of petitioner's inclusion of an animal in a molestation involving Doe. The sentencing court found Doe credible, and the detailed and careful parsing of the facts for which petitioner was found guilty were discussed at length by the sentencing court. [Doc. No. 10-52, at pp. 7082-89]. This Court agrees that the introduction of the statement was harmless, and the ultimate sentence imposed would have been no different if the statement had been precluded.

Accordingly, the Court **RECOMMENDS** that petitioner's claim for relief due to the admission of the non-*Mirandized* statement be **DENIED**.

### E.    Claim Six Alleging *Apprendi* Violation Re Restitution Award

Petitioner challenges the imposition of a victim restitution award of $400,000. [Doc. No. 1, at pp. 20-22]. Even though this claim is based on Supreme Court law, it is not cognizable on federal habeas review. A federal court may entertain a habeas petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence." *Bailey v. Hill*, 599 F.3d 976, 981-82 (9th Cir. 2010); *see also United States v. Thiele*, 314 F.3d 399, 400 (9th Cir. 2002) (claim challenging a restitution fine is not cognizable basis for habeas relief because such claims do not challenge the validity or duration of confinement); *United States v. Kramer*, 195 F.3d 1129, 1130 (9th Cir. 1999); *Williamson v. Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998) (imposition of a fine is "merely a collateral consequence of conviction" and, as such, is not sufficient to establish federal habeas jurisdiction). Petitioner's sole claim does not provide a cognizable basis for habeas relief. Petitioner is, therefore, not entitled to relief with regard to his third claim.

Moreover, to the extent petitioner alleges a violation of the Eighth Amendment, this Court also recommends petitioner's claim be denied. "The Eighth Amendment provides that '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' U.S. CONST. amend. VIII." *Norris v. Morgan*, 622 F.3d

3:16-cv-02650-BAS-KSC

1276, 1285 (9th Cir. 2010). To establish an Eighth Amendment violation, a fine must be "'grossly disproportional to the gravity of a defendant's offense.'" *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003) (citing United States v. Bajakajian, 524 U.S. 321, 334 (1998) (applying the Eighth Amendment's excessive fines clause to punitive forfeitures)). Given that petitioner was convicted of committing multiple counts of child molestation of his daughter, the $400,000 victim restitution order imposed by the state court was not so grossly disproportionate to his offenses that it violates the Eighth Amendment.

Accordingly, the Court **RECOMMENDS** that petitioner's claim be **DENIED**.

### F.    Claim Six Alleging Cumulative Error

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). As both the state court and respondent correctly note, cumulative error is unavailing. Indeed, the single error identified by the Court of Appeal – the allegedly inappropriate introduction of a non-*Mirandized* statement at the sentencing hearing – was determined not to be a violation of clearly established Supreme Court precedent as discussed in Section D, *supra*. Thus because no errors occurred, no cumulative error is possible. *Hayes v. Ayers*, 625 F.3d 500, 523-24 (9th Cir. 2011) (stating that "[b]ecause we conclude no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

Accordingly, the Court **RECOMMENDS** that petitioner's claim be **DENIED**.

### <u>CONCLUSION</u>

This Court submits this Report and Recommendation to United States District Judge Bashant under 28 U.S.C. § 636(b)(1) and Local Civil Rule 7.21(d)(4) of the United States District Court for the Southern District of California. For the reasons outlines above, IT IS HEREBY RECOMMENDED that the Court issue an order (1) approving and adopting this Report and Recommendation; and, (2) DENYING the Petition for Writ of Habeas Corpus.

IT IS HEREBY ORDERED THAT no later than **45 days from the issuance of this order,** any party may file written objection with the District Court and serve a copy on all parties. The document should be entitled "Objections to Report and Recommendation."

IT IS FURTHER ORDERED THAT any reply to the objections shall be filed with the District Court and served on all parties no later than **ten days after being served with the objections.** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the District Court's order. *See Turner v. Duncan*, 158 F.3d 449, 445 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: November 21, 2017

Hon. Karen S. Crawford
United States Magistrate Judge